Filed 5/8/14  P. v. Gutierrez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B242692 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA115351) |
| v. | |
| OMAR GUTIERREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Paul A. Bacigalupo, Judge.  Affirmed.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Omar Gutierrez of second degree murder (Pen. Code, § 187, subd. (a))[1] and assault causing the death of a child (§ 273ab). He was sentenced to a total term of 25 years to life, and the trial court ordered him to pay a $5,000 restitution fine under section 1202.4, subdivision (b). On appeal, defendant contends the trial court erred when it instructed the jury with CALCRIM No. 361, concerning a testifying defendant's failure to explain or deny evidence against him. He also contends the prosecutor committed several acts of misconduct, and cumulative error. Lastly, defendant contends the trial court did not assess his ability to pay when it ordered him to pay the $5,000 restitution fine. We find no prejudicial errors and affirm defendant's conviction.

## FACTS

Mother Veronica Acosta met defendant at the Ranch Market in Compton where they both worked. He moved in with her in October 2010, two or three months after they met, when he lost his job at the Ranch Market. Also in the home were mother's children, two-and-a-half-year-old Leslie and nine-year-old Anthony. The family lived in a one bedroom apartment. The children shared the bedroom, and mother and defendant slept in the living room. Shortly after defendant moved in with the family, mother learned she was pregnant with his child.

Mother worked 35 to 40 hours a week. When defendant moved in with her family, he started watching Leslie while mother worked. Mother began to notice unusual bruises on Leslie's thighs and back. Leslie never suffered strange bruises when she was cared for by her previous babysitters, before defendant moved in with the family. Mother never saw Leslie fall in a manner that would explain the bruises. When mother asked Leslie what happened in defendant's presence, Leslie said she had fallen. Since defendant moved in with them, Leslie's behavior had changed; she was "a little bit more, like, quiet."

---

[1]    All statutory references are to the Penal Code.

Leslie began walking when she was 15 months old. Leslie "would never watch where she was going." She would bump into things and sometimes fall, but she never got large bruises. Instead, she would get small, normal bruises on her elbows and knees when she fell. Leslie never had big bruises on her face, thighs, back, or stomach before defendant moved in with them. Leslie was pigeon-toed; her feet turned in. However, Leslie's doctors never indicated that she needed any treatment for her feet.

On November 11, 2010, mother had the day off from work because it was Veteran's Day, and Anthony did not have school. That afternoon, mother, defendant, and the children went to the park. They arrived sometime between 1:00 and 3:00 p.m. Leslie never complained of a stomachache. She played on the playground equipment, and did not have any falls. She also ate corn on the cob. While at the park, mother noticed defendant giving "love bites" to Leslie on her arms. When they returned home, around 4:00 or 5:00 p.m., they watched some television and then ate dinner. Leslie did not complain about being in pain or feeling sick. She had a "Cup of Noodles" soup for dinner. She went to bed between 8:00 and 9:00 p.m. Leslie slept through the night and did not complain about a stomachache or any pain.

The next morning, mother woke up at 6:30 to get ready for work. Mother had to walk through the bedroom to access the bathroom. Leslie was sleeping, and appeared normal. Mother's work shift was from 7:00 a.m. to 3:00 p.m. that day. Defendant drove mother to work, leaving the children at home. It was a school day for Anthony, who usually attended school between 7:30 a.m. and 3:00 p.m. Because mother was at work and Anthony was at school, defendant was alone with Leslie.

While at work, mother called to check on Leslie. That day, when she called during her lunch break, defendant told her that Leslie had a stomachache. Leslie did not frequently get stomachaches. It was unusual that she had a stomachache as she was feeling well the day before. When mother called again at 2:00 p.m., defendant told her that Leslie's stomach still hurt. At 3:00 p.m., defendant picked mother up from work, but did not bring the children with him as he usually did. He told mother he left them at

home because Leslie was not feeling well. Mother and defendant arrived home sometime between 3:00 and 3:20 p.m.

Mother checked on Leslie as soon as she and defendant got home. Leslie would usually greet mother by running to her and hugging her. However, Leslie lay on her bed, only wearing a diaper. She seemed like she "didn't have energy" and she "needed . . . to rest." Leslie's stomach was swollen. She told mother that her stomach hurt, and placed her hand over her stomach. She also complained that she was thirsty. Mother put some clothes on Leslie, and either mother or defendant gave her some juice. Defendant had given Leslie Tylenol earlier that day, and was preparing to leave to purchase some Pedialyte and more Tylenol when Leslie started to have a seizure, grinding her teeth and twisting her arm. Defendant called his sister for advice. Defendant then called paramedics.

Leslie became unresponsive and "was just laying there." Mother started "pushing a little bit by her heart" and doing "mouth-to-mouth." Mother never pushed on Leslie's stomach. At some point when mother was performing CPR, defendant took over and started chest compressions. Paramedics arrived within minutes. Mother rode in the ambulance with Leslie to St. Francis Medical Center. After they arrived, she learned that Leslie had died.

Mother noticed a bruise on Leslie's back a week before she died. Leslie did not complain that her back hurt. Leslie never had any accidents that required medical treatment.

Mother never beat, punched or kicked Leslie. Leslie and Anthony had a good relationship. Defendant and Leslie also appeared to have a good relationship. Leslie did not seem to be afraid of him, and would refer to defendant as "daddy."

Leslie and Anthony's father had abused mother. He was eventually deported for domestic violence. According to mother, there was no violence in her relationship with defendant.

Elvira Garcia had been Leslie's babysitter from April 2010 until October 2010. Garcia has four children of her own. She cared for Leslie Monday through Friday, and

4

sometimes on Sunday, while mother worked. During the time she cared for Leslie, Garcia never saw any unusual bruises on Leslie's body. She never saw bruises on her stomach, back, legs, or face. Leslie would fall down like any normal child. She did not get large bruises from these falls, and did not bruise easily.

Garcia last saw Leslie on November 1, 2010, when she went to mother's home. Anthony, Leslie, and defendant were there. Leslie acted strange. When Garcia greeted her, she turned away and did not say anything. Leslie had a protruding egg-shaped bruise on her forehead.

Mother's sister, Griselda Acosta, babysat Leslie while mother worked, when Leslie was between the ages of one and two. Griselda has three children. Leslie would fall like other children, and would only have normal bruises and bumps. When she tripped and fell, Griselda never noticed any unusual bruises. Leslie would only get scratches and bruises on her elbows and knees. Griselda never saw bruises on her face, stomach, thighs, or back. Griselda saw Leslie hit her head on a pole once, but she did not get a bruise.

Once defendant started caring for Leslie, Griselda saw Leslie on two occasions. On October 31, 2010, Griselda noticed a bruise on Leslie's forehead. Griselda told mother to take Leslie to the doctor. Griselda, her children, mother, defendant, Anthony and Leslie went trick-or-treating. Leslie did not seem afraid of defendant.

When Griselda saw Leslie again on November 2, 2010, Leslie had a bruise on her forehead and her forehead was swollen. The bridge of Leslie's nose was puffy and bruised, and her eyes were swollen. Griselda had never seen Leslie with injuries like this before.

William Sierra, a paramedic with the City of Compton responded to a call on November 12, 2010, at 4:05 p.m., that a two-year-old child was having difficulty breathing. When he entered the home, mother was standing in the living room, and Leslie was on a bed in the bedroom. Defendant was leaning over her. Leslie appeared to be dead. Her eyes were half open and "she was kind of gray." Defendant was "real calm," and was not panicked. Sierra noticed some bruises on Leslie's face. She did not

5

have a pulse and was not breathing.  Sierra picked her up and carried her to the ambulance.  Once in the ambulance, Sierra cut off Leslie's shirt to put her on a cardiac monitor.  Sierra noticed that Leslie "had a lot of bruising going on in the whole chest area and in the stomach area . . . .  It was really surprising how much it was.  It was a lot."  The bruises were not consistent with a normal accident.  Law enforcement was automatically dispatched to the scene, as is the custom for all calls involving abused children.

Denise Bertone is a coroner investigator for the County of Los Angeles.  She responds to unexpected deaths and examines the body, writes a report and takes photographs for the physician who will conduct the autopsy.  Bertone investigated Leslie's death after it was reported by St. Francis Medical Center at 4:40 p.m. on November 12, 2010.  When Bertone examined Leslie's body, she noticed that the top of Leslie's head was "boggy" or "spongy," as if blood had collected there from some sort of trauma or impact.  Leslie had bruises on her forehead, a laceration below her right eye, a small bruise on her left eyelid, and a bruise on the outer-side of her left eye.  Leslie had some scratches on her nose.  There were also bruises on her right cheek, her right jaw, under her chin and on her lip.  Also, the webbing between her upper lip and her gum (the frenulum) was split open.  This injury appeared to be new, as there were no signs of healing.  Leslie also had bruises on her arms, and bruises on the backs of her hands.  Her stomach was distended.  It was round, hard, and covered in bruises.  Leslie had bruises on her back and buttocks.  There was also a large bruise on Leslie's right hip extending down over her thigh.  There was a bruise on her left thigh.

Leslie's injuries were not that of a normal, healthy toddler, who will have some bumps and bruises.  There were no injuries to the palms of Leslie's hands.  A toddler who falls will typically put her hands out to protect herself.  It was obvious to Bertone from the extent of her injuries that Leslie had been killed.

Dr. Juan Carrillo, a deputy medical examiner for the Los Angeles County Coroner, performed the autopsy on Leslie.  Dr. Carrillo diagrammed Leslie's injuries, and noted "multiple . . . bruises . . . to the forehead, to the scalp area, to the right side of the cheek;

6

abrasions or scrapes noted to the nose; bruising to the chin area; contusions to the left cheek; and a laceration, or cut, to the [frenulum]." Leslie had 3 quarter-inch bruises on her forehead. The injury to the frenulum was a fresh injury that occurred near the time of death. The frenulum injury is uncommon in a child. It usually occurs when something is placed in the mouth forcefully, "or if someone is trying to cover the mouth and apply force and move the hand back and forth, causing tearing of that tissue." The bruises on Leslie's left cheek were consistent with a hand being placed over her mouth. It is unusual to see so many bruises on a child's face.

There were no bruises on Leslie's chest where CPR would be performed. "There were multiple . . . bruises noted over the entirety of the abdomen." There were also multiple bruises on Leslie's arms, legs, and back. One of the bruises on her right thigh was large, and had the appearance of a hand. It could have been caused by a "hard slap."

When Dr. Carrillo cut into the bruises on Leslie's back to assess their depth, he found that the bruises were deep. These bruises were not typical for a fall as toddlers generally fall forward. The bruises were caused by multiple impacts rather than a single impact. On cross-examination, Dr. Carrillo agreed that it was possible that the bruises could have resulted from a fall on concrete stairs.

Leslie had several bruises on her scalp. There were injuries to the back of her head, on both the left and the right side. Dr. Carrillo opined these injuries would have been caused by blows to the head. They were not likely caused by a single, typical fall.

There were also oval-shaped bruises on Leslie's arms initially thought to be bite marks. However, on closer examination, they did not appear to be made by teeth. Rather, a circular-shaped object must have struck her arms.

The extent of the bruising on Leslie's body indicated there was abuse.

When Dr. Carrillo made the Y-incision to perform the autopsy, one liter of "foul smelling, brownish fluid came out of the abdomen." There should not be any fluid "floating around in the abdominal cavity." There were also partially digested "tan, friable food particles" floating in Leslie's abdominal cavity. They were likely not vegetables because the particles were not fibrous. Dr. Carrillo was not sure what they

7

were. The particles could have been meat, or beans. It could not have been rice. Dr. Carrillo did not think the food particles were noodles, but could not rule that out.

After the fluid was removed, Dr. Carrillo discovered that the "intestine had been torn apart, . . . there was a complete transection of the intestine where one part did not connect with the other." The tear was at the duodenal-jejunal junction, near to where the stomach and small intestine meet. This junction appears in the mid-abdomen, above the belly button.

The transection could be explained by "some force [that] was applied from the . . . front of the body, compressing the intestines against the spine and then having some sort of sheering force to pull it apart." It was not caused by gentle pushing on a swollen stomach. The injury would require force such as "stomping on the abdomen, punching or kicking, or maybe compressing the body against an edge of a table." However, Leslie did not have bruising consistent with being pressed against a table. The bruises on Leslie's abdomen were consistent with the location of Leslie's internal injuries.

The transection of the intestine killed Leslie. It caused extensive fluid loss, and prevented Leslie from rehydrating. Bacteria was released into Leslie's abdominal cavity, "and all this can lead to an acute shock type of environment where you're losing volume in your blood." That type of shock leads to death rapidly, probably in a matter of hours. The injury would cause pain because of the fluid and gas being released into the abdominal cavity. If Leslie's belly appeared distended, it was consistent with gas and fluid being released into her abdominal cavity. Dr. Carrillo had seen transections caused by abdominal blows in two previous autopsies of children. Dr. Carrillo has seen this injury in adults, resulting from car accidents, plane accidents, or people crushed by cranes. He has never seen such an injury from a simple fall.

To determine the timing of the injury, Dr. Carrillo examined the rest of Leslie's digestive tract. He found a kernel of corn in the sigmoid colon, just before the anus. Dr. Carrillo concluded that Leslie must have eaten the corn before the tear occurred. The kernel could not have gotten past the ruptured site. It usually takes between 12 and

8

24 hours for a corn kernel to be expelled after it is eaten. Therefore, knowing when Leslie ate the corn would narrow down the timeframe in which the injury occurred.

Dr. Carrillo also microscopically examined the tissue at the tear. The exam was consistent with trauma, as there were red blood cells present and no disease that would have weakened Leslie's tissues. There were few inflammatory cells at the site of the injury. Usually, three or four hours pass before there is an acute inflammatory response to the site of an injury. Based on the number of inflammatory cells present, Dr. Carrillo estimated the injury occurred three or four hours before Leslie's death. Looking at the bruised tissue on her abdomen with a microscope, these injuries also seemed to have occurred three to four hours before Leslie died. Dr. Carrillo's findings also indicated that Leslie had an appropriate inflammatory response; therefore, he was confident in his timing estimates.

Leslie also had bleeding in her pancreas and injury to the surrounding tissue of the right kidney consistent with blunt force trauma to the abdomen. These injuries could not be explained by a normal childhood fall, even if the toddler was slightly pigeon-toed. Dr. Carrillo opined that the fatal injury was inflicted and nonaccidental. Abdominal injuries are the second most common fatal child abuse injury. The most common are head injuries, and there was evidence of head injuries to Leslie.

The bruises on Leslie's scalp and thigh were more than 24 hours old. The bruises on Leslie's left buttock and right thigh were more than 24 hours old. Dr. Carrillo estimated they were two to three days old. The bruising on Leslie's stomach was three to four hours old, but possibly up to 24 hours old because the immune response observed could possibly take up to 24 hours to achieve in some people. It was possible that the fatal injury could have occurred up to 24 hours prior to Leslie's death. When estimating time of death, a range is provided to account for the slow digesters and slow healers as well as the fast ones. As for the standard range, which Dr. Carrillo had every reason to believe Leslie belonged within, he believed the injury occurred three to four hours before death. Given her time of death, it appears the injury occurred sometime after the noon hour on the day she died.

9

Dr. Carol Berkowitz is the executive vice chair of the department of pediatrics at Harbor UCLA Medical Center. She is also a professor of pediatrics, and is board certified in child abuse pediatrics. After reviewing Leslie's medical records and the coroner's report, Dr. Berkowitz opined that Leslie's injuries were inflicted. She agreed with Dr. Carrillo's assessment that the fatal injury was three to four hours old.

A torn frenulum is highly indicative of inflicted trauma, as it is not an injury that is caused accidentally. A child suffering from a complete transection would be very uncomfortable and would report a stomachache. She would be thirsty due to the lost fluid volume. The lost fluid volume could also cause a seizure. Shock would result from the injury within just a few hours.

The injury would be caused by "blunt force trauma with a very focused blow to the abdomen." A punch or kick to the abdomen could cause such an injury. The injury could not be caused by a trip or fall. "Short falls do not lead to transections of the small intestine." Dr. Berkowitz has seen this type of injury four or five times. The only accidental injury of this type she has seen was caused by a car crash. The others were caused by punches or kicks to the abdomen. The force resulting in the transection could not have been inflicted from the back. Falls on the back do not lead to abdominal injuries. A complete transection requires a significant amount of force to be applied. A grown adult could cause such an injury.

Abdominal injuries are common in cases of child abuse, and have a high mortality rate because the perpetrators do not seek medical care.

Dr. Berkowitz believed Leslie's injuries were inflicted. It looked as if Leslie had been injured on multiple occasions, and had numerous traumatic injuries, which supported a conclusion that she was being abused. These injuries were not in places where you would typically see bruises from normal childhood injuries, such as on the shins. Nothing in Leslie's medical records indicated that Leslie bruised easily. Knowing that Leslie was pigeon-toed would not change Dr. Berkowitz's assessment. All children in the three- to four-year-old age range are slightly pigeon-toed.

10

Rosa Espinosa, defendant's older sister, testified for the defense. Defendant came from a large family of eight boys and two girls. Defendant was closest to Rosa. Defendant came to the United States in 1994 or 1995, when he was 17 years old. He went to live with Rosa in Colorado for six years.

At the time defendant moved in with Rosa, she had one three-year-old daughter. Rosa later gave birth to a second child. Defendant played with Rosa's children a lot, and they never told Rosa they were afraid of him. When he was unemployed, he cared for Rosa's children while she worked.

After defendant moved to California, he would contact Rosa by phone, two or three times a week. Rosa knew that defendant was living with mother, and was concerned because he had only recently met mother, and Rosa believed defendant should live with their brother, Israel, who also lived in Los Angeles. When she spoke with defendant on the phone while he was living with mother, Rosa heard children happily playing in the background.

Defendant called Rosa twice on November 12, 2010. Defendant called her at 2:00 p.m. (Pacific Standard Time) and sounded a little worried. She gave defendant some health advice. Their conversation lasted 30 minutes. Defendant called again around 4:00 p.m. (Pacific Standard Time), and Rosa could hear mother in the background. Defendant's tone was the same as it was during the first call.

Defendant is usually a calm person, who does not easily lose his temper.

Israel Zirate, defendant's older brother, testified that defendant lived with him in Los Angeles in the summer of 2010. Defendant moved out of Israel's house to live with mother. Israel did not think it was a good idea for defendant to move in with mother because he did not know her well. Israel's three children, who at the time of trial were 20, 18, and 17, lived with him in 2010 when defendant lived there as well. Defendant also lived with Israel beginning in 2000, for two and a half years. In 2000, Israel's children were approximately five or six years old, six or seven years old, and eight, nine, or ten years old. Defendant was "very tender" with Israel's children. "He liked to take them to the park." Israel allowed defendant to take his children to the park unsupervised.

11

When defendant was living with Israel in 2000, he started to date Roselia Serrano, who lived across the street. Roselia had children.

Israel's children never complained about defendant, and were close to him. They did not seem to be afraid of him, and "would follow him a lot." Defendant would take them out to breakfast, unsupervised. Israel was not fearful that defendant would harm his children. Defendant was a calm person. He did not lose his temper or anger easily.

Defendant's former girlfriend, Roselia, testified that defendant lived with her for seven years. She met defendant in 2002 and they started living together in 2003. At the time of trial, Roselia had four daughters, ages 25, 18, 15, and 13. At the time defendant started living with Roselia and her children, her daughters were four, six, ten, and 16.

Defendant was not always employed. When Roselia was working and defendant was not, he would take her children to school. He would also take them to the park, unsupervised. There were other times defendant was alone with Roselia's children as well. Roselia was not concerned about leaving her children with defendant. Her daughters would tell her they loved defendant. She never saw any unexplained injuries or bruises on her youngest daughter while defendant lived with them.

Roselia did not want to have children with defendant. They ended their relationship in 2010. When defendant moved out of Roselia's home, he rented a room from a family. He then went to live with his brother Israel, and later moved in with mother.

Roselia's oldest daughter, Sandra Serrano, testified that she was 16 when she first met defendant. Sandra moved across the street when she was 19, but she still visited her mother, sisters, and defendant a lot. She has two children, and would take them to her mother's home when defendant still lived there. She liked living with defendant. He "was very responsible. [Her] kids loved him. [Her] sisters loved him. It was a good experience. He had a lot of patience with [her] kids and [her] sisters." Sandra's younger sisters seemed to enjoy being around defendant as well. Her youngest sister, who was four when defendant came to live with them, never appeared to be afraid of defendant.

12

Detective John Duncan was called as a defense witness. He has testified in court a number of times, and in many cases 911 calls have been played to the jury. Investigating officers can preserve 911 calls as evidence. They can be played in court to determine the "emotional tenor" of the caller. Defendant's 911 call in this case had not been saved at the time that Duncan and his partner, Detective Guzman, went to retrieve it. Detective Duncan did not remember when they tried to recover the tape.

Dr. Silvia Comparini is a forensic pathologist licensed in New York and the District of Columbia. She reviewed Dr. Carrillo's report, as well as X-rays, including a chest X-ray taken at the hospital. Dr. Comparini testified that Leslie "has atypical pigeon-toed or in-toed changes." Most three-year-old children have a minimal pigeon-toe, but not to the degree Leslie did. Leslie's X-ray of her feet did not look normal.

According to Dr. Comparini, Leslie could have sustained her injury more than 24 hours before her death. There was evidence of infective inflammation at the site of the injury. The presence of corn in the colon does not indicate that Leslie was injured after eating the corn. There is no way to time how long it could take an individual to digest food based on the contents of the bowels.

Dr. Comparini also opined that the transection could not be caused by a hit to the stomach. There would have to be injury to the liver, and there was no injury to Leslie's liver. There also would be greater damage to the pancreas. The fatal injury could be caused by a fall on the back. When showed a picture of Leslie, Dr. Comparini identified a number of bruises on her back. She estimated they were at least three or four days old. The line-shaped bruises follow a pattern corresponding to Leslie's ribs. The transection occurred at the site of the bruises on Leslie's back.

The site of the transection was well above the belly button, and there was no bruising in that area. Moreover, the bruises on Leslie's stomach were in different stages of healing, and therefore did not occur at the same time. The bruising pattern did not appear to be caused by a fist, by a kick with a shoe or a foot. The bruises were consistent with finger pressure marks.

13

Dr. Raymond Philips is a chiropractor. Defendant was a patient of his, and came for 30-minute treatments on November 8, 9, and 10, 2010. Dr. Philips did not recall whether he personally (as opposed to his staff) treated defendant. There are stairs in the back of the plaza where his office is located. He can see the stairs from his office if the blinds are open, but they are usually closed. Detectives Duncan and Guzman interviewed Dr. Philips about defendant. There were surveillance cameras at the plaza that were operating in 2010. He gave the detectives the landlord's number so they could contact the landlord about obtaining the tapes.

Dr. Philips never saw a child with defendant when he came in for treatment, and defendant never told him he had a child with him. Defendant never mentioned that anyone fell on the stairs at the building. Dr. Philips's office is on the first floor. There would be no reason for anyone visiting him to use the stairs.

Defendant testified. He knew mother from the Ranch Market, where they both worked. They knew each other for about three or four months before defendant moved in with her. Defendant learned that mother was pregnant with his child about one week before he moved in to her home. Defendant was "very happy" mother was pregnant because he had "always" wanted to have a child.

Defendant met mother's children shortly after meeting mother, within two or three weeks. Defendant would give mother rides home from work, or rides to the babysitter to pick up her children. Defendant liked Anthony, and helped him with his homework sometimes. He also liked Leslie, but "I cannot say that I loved her because I had met her for a short time, but I liked her." He did not love Anthony either, but liked him. Both of the children started calling him "daddy" two weeks after defendant moved in with them. Defendant never harmed mother or her children.

On November 11, defendant and Anthony went to the store while mother cleaned the house. Later, mother cooked some food, and they watched television. Mother's sister, Griselda, called and said she wanted to go to the park. They waited at their house until it was time for Griselda to get off work at the Ranch Market. They went to the Ranch Market to meet Griselda at 3:00 p.m., but she decided she wanted to go home

14

instead. So they went to the park without her, and got there close to 4:00 p.m. Defendant, mother, and the children stayed at the park for a couple of hours. The children played and he and mother sat on a bench, about 50 feet away. Defendant and mother could not see the children very well because bathrooms were blocking their line of sight. They brought corn dogs from home and bought corn on the cob at the park, half way through their visit. They left the park 40 to 50 minutes after eating the corn. When they got back home, Leslie ate a "Cup of Noodles" soup for dinner. Leslie and Anthony were in bed by 9:00 p.m.

On the morning of November 12, mother woke up before defendant did. Anthony and Leslie were still in bed when defendant drove mother to work. Defendant returned home, and Leslie ate some cereal before she and defendant dropped Anthony off at school, shortly before 8:00 a.m. Defendant returned home with Leslie, and the two of them went to the market around 9:00 a.m. On the way home from the market, they stopped at Rite Aid. They got back to their apartment around 11:30 a.m. or 12:00 p.m. At approximately 12:30 p.m., defendant gave Leslie beans to eat with either rice or a tortilla. Leslie did not eat much. Leslie complained of a stomachache, for the first time, after eating lunch.

Mother always called defendant to check in when she worked and defendant watched Leslie. On November 12, 2010, mother called defendant's cell phone in the morning around 9:00 or 10:00. She called again around 1:00 p.m. At that time, Leslie was complaining about a stomachache. When Leslie spoke with mother on the phone, Leslie told mother that her stomach hurt. Leslie and mother spoke on the phone for five or ten minutes. At the time of the call, defendant was not concerned that Leslie had an "urgent medical emergency," but he "was worried." Defendant asked mother to come home from work, but she could not leave.

Before mother's 1:00 p.m. call, defendant called his sister, Rosa. He called her after Leslie complained of a stomachache, thinking Rosa could give him some advice. He did not call mother because she could not answer her phone while at work. Defendant followed Rosa's advice and it appeared to help a little bit.

15

After Leslie spoke with her mother at 1:00 p.m., Leslie drank some milk, juice and tea. Leslie threw up two or three times before mother returned home from work. She threw up once in the bathroom and once on the bed.

Defendant went to pick up mother at work. Anthony was home; he had taken the bus home from school. When defendant arrived at mother's work, he told her that Leslie still had a stomachache. He did not think it was an emergency.

Later, after mother got home, defendant felt the situation was urgent. Leslie seemed dehydrated, and "she didn't have any strength." He could tell she was dehydrated because she "was very thirsty." Defendant decided to call 911 when Leslie started convulsing while mother was in the bedroom with her. At the time that Leslie started convulsing, defendant was on his way out of the house to buy Tylenol for Leslie.

When defendant called 911, the operator spoke English. Defendant speaks only a little English and does not understand it well. After one or two minutes, a Spanish speaking operator got on the phone, and defendant spoke with them. As far as defendant could tell, Leslie was still breathing at the time he was on the phone with the Spanish speaking operator.

The 911 operator advised defendant to push on Leslie's chest and stomach. Defendant did not do so because he was on the phone. He told mother what the operator said to do. Defendant told the operator that Leslie's stomach was swollen, and the operator asked him to press on Leslie's stomach to determine whether her stomach was hard. Defendant pushed on her stomach twice, using both hands. Defendant also pressed on her chest about three times. After defendant pressed on Leslie's chest, mother did it as well. Defendant was on the phone with 911 for about three or four minutes. After he hung up the phone, he did not touch Leslie. He opened the front door for paramedics. Defendant was in the living room when paramedics arrived. Leslie and mother were in the bedroom, but mother walked out of the room when the paramedics came inside. Defendant did not go into the bedroom with the paramedics. He was outside with mother talking to one of them.

16

Dr. Philips provided chiropractic treatment to defendant. On November 10, 2010, defendant went to Dr. Philips's office with Leslie. Leslie fell on her back on the stairs at the office. Defendant was standing at the door to Dr. Philips's office when he noticed Leslie start to fall. He ran to Leslie and grabbed her. She complained that her back and head hurt. Defendant went home with Leslie instead of going to his appointment with Dr. Philips. Defendant did not see any blood on Leslie; just a scrape on her back.

When Leslie rode in defendant's car, she sat in the back in a child's car seat. Sometimes Leslie would unbuckle herself and would not wait for defendant to get her out of the car seat. She had trouble exiting the car and fell out the door of the car at least twice. The first time she fell, she and Anthony were playing a game to see who could get out first. She got out first, fell, and hit her forehead and face. The second time, "it was the same thing." Mother was there. These falls happened within a week of her death.

Leslie got the cut under her eyebrow because she "hit herself" in the bathroom. Defendant was in the kitchen when it happened. When Leslie came out of the bathroom and told defendant she had hit herself, she was not crying. Defendant put salt or "some kind of lotion" on the cut.

Defendant was asked, "prior to the day Leslie passed away, had you ever noticed any bruising anywhere on her body?" Defendant answered, "yes," and when asked where the bruises were located, testified that Leslie had bruises on her "hands, one leg, in the back." When asked whether he saw bruises "anywhere else," he responded, "No, no, no. [¶] . . . [¶] Since [mother] would change her [diaper], I don't know."

Defendant testified that Leslie and Anthony got along, but sometimes Anthony made Leslie cry. He would bite her fingers or pull her hair.

Defendant did not punch Leslie in the stomach. He did not kick her. He did not try to hurt her with "any kind of tool." He never had a "really big argument" with mother while they were living together. He never lost his temper with mother or with Leslie or Anthony.

During cross-examination, defendant admitted he told detectives that he informed Dr. Philips about Leslie's fall. He also told detectives Leslie had only scraped her back

17

in the fall. Defendant told detectives that Leslie's first fall from his car had happened 15 days before her death. "Even though Leslie wasn't injured" in that fall, defendant told mother "because [he] didn't want her to think that [he] was beating her daughter."

Defendant admitted he was the only person with Leslie the day she died.

The prosecutor called Dr. Berkowitz as a rebuttal witness. She testified that Leslie's fatal injury could not have been caused by a fall from defendant's car, or from a fall on some stairs. The force of the injury had to be from the front, as pressure on the spine caused the tear to Leslie's intestines. She was not surprised that Leslie's liver was not injured, as it is in a different part of the abdomen.

## DISCUSSION

Defendant contends that the trial court erred when it instructed the jury with CALCRIM No. 361, arguing that he was not required to explain the origin of all of Leslie's bruises. He also contends the prosecutor committed misconduct when she argued facts not in evidence, misstated the law, and appealed to the passion and prejudice of the jury. Defendant contends the cumulative effect of the errors rendered defendant's trial fundamentally unfair. Lastly, defendant contends the trial court erred when it did not consider his ability to pay the $5,000 restitution fine. We reject all these contentions.

### 1. CALCRIM No. 361

Defendant contends he was prejudiced when the trial court instructed the jury with CALCRIM No. 361 over defense objection. CALCRIM No. 361 provides: "If the defendant failed in (his/her) testimony to explain or deny evidence against (him/her), and if (he/she) could reasonably be expected to have done so based on what (he/she) knew, you may consider (his/her) failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

Our review of a claimed instructional error is de novo. (*People v. Shaw* (2002) 97 Cal.App.4th 833, 838.) CALCRIM No. 361 has no constitutional or other infirmity. (*People v. Saddler* (1979) 24 Cal.3d 671, 675 (*Saddler*) [addressing CALJIC No. 2.62];

18

see also *People v. Rodriguez* (2009) 170 Cal.App.4th 1062, 1064.) The court's role in deciding whether to give the instruction is to determine if there were any "facts or evidence in the People's case which defendant failed to explain that were in his particular knowledge to explain . . . ." (*Saddler,* at p. 683.) A contradiction is not a failure to explain or deny. (*Id.* at p. 682.) Moreover, a fact that defendant failed to explain or deny must have been "within the scope of relevant cross-examination." (*Ibid.*) If testimony on a particular fact was not elicited, defendant has not failed to explain or deny the evidence against him. (*Ibid.*)

Defendant contends he did not fail to explain or deny any evidence that was within his knowledge, and that he cannot be faulted for failing to explain evidence about which he was not cross-examined. Respondent contends that defendant was asked whether he saw any bruises on Leslie's body, and he claimed to only notice bruises on "her hands, [and] one leg, in the back." According to respondent, this testimony creates a logical gap and is implausible, warranting instruction with CALCRIM No. 361.

We agree the instruction was properly given because there were gaping holes in defendant's testimony. There were stark, indisputable facts that defendant failed to explain. And defendant was the *only* person who had the particular knowledge to explain those facts. The stark, indisputable facts boil down to this: Leslie was sleeping and appeared normal when her mother went to work early in the morning, leaving Leslie in defendant's care, and when mother returned home, Leslie was badly beaten, listless, suffering pain, had a seizure, and died from a blow that severed her intestines. Defendant was alone with the child all day, and certainly, he could reasonably have been expected to explain what happened to Leslie.

The prosecution offered additional evidence against defendant that made inescapable the conclusion that defendant caused Leslie's sudden, violent death -- evidence that defendant would be expected to explain if indeed he had not murdered her. The day before, Leslie had played in the park happily without complaint of pain. The membrane inside her mouth connecting the upper lip to her gum was not split open. The top of her head was not spongy or boggy. Her face and body were not covered in bruises.

19

She ate corn on the cob without complaint of stomachache and her stomach was not distended. She did not complain of thirst or appear to be dehydrated. She slept through the night before her death without waking or crying. But by the end of her last day that she spent alone in defendant's care, the top of her head had suffered trauma, her upper lip frenulum had split open, she had scratches and cuts on her face, her intestines were severed, and her face and body were covered in bruises. The percipient and expert testimony describing these severe injuries to Leslie was substantiated by many postmortem photographs that were entered in evidence. The defense expert did not dispute the severity of Leslie's injuries. The defense expert testified the fatal injury could have been sustained more than 24 hours before the child's death. But there was no direct or circumstantial evidence to suggest that any witness observed the split frenulum, the soggy head, the multiple bruises and cuts on Leslie's face, or her distended stomach at any time before mother left for work and Anthony left for school on the day Leslie died. Yet defendant offered no explanation of what happened to Leslie that day. He described an ordinary day during which Leslie ate breakfast and lunch and drank juice, went to the market and Rite Aid with defendant, and did not complain of stomachache until after lunch. Defendant testified her stomachache appeared to be so benign that he planned to treat it with Tylenol. How were her intestines torn apart, filling her abdomen with a liter of foul smelling, brownish fluid? This case is the paradigm for CALCRIM No. 361.

We turn briefly to respondent's contention the instruction was also proper because defendant's testimony was implausible. When a defendant testifies and "fails to deny or explain inculpatory evidence or gives a 'bizarre or implausible' explanation, the instruction is proper." (*People v. Sanchez* (1994) 24 Cal.App.4th 1012, 1029-1030.) Thus, there is authority that in some circumstances, plausibility may be a proper consideration in giving the instruction. (See *People v. Mask* (1986) 188 Cal.App.3d 450, 455 [the instruction is warranted "if the defendant tenders an explanation which, while superficially accounting for his activities, nevertheless seems bizarre or implausible"]; but see *People v. Kondor* (1988) 200 Cal.App.3d 52, 57 [the instruction (CALJIC No. 2.62) is unwarranted "when a defendant explains or denies matters within his or her

20

knowledge, no matter how improbable that explanation may appear"].)

Mother testified that Leslie was only wearing her diaper when she got home from work. Given the extensive expert testimony about the extent of her injuries, and the trial exhibits showing numerous observable bruises on many portions of Leslie's body, it is implausible that defendant did not notice any bruises other than those on her hands, and one on her leg. Leslie had multiple bruises on her face, arms, stomach, back, legs, and buttocks, which would have been readily observable if she was only wearing a diaper, or even if she was clothed.

In *People v. Roehler* (1985) 167 Cal.App.3d 353, the instruction was deemed proper where the defendant was present on a boat with his wife and stepson when the boat capsized, and his wife and stepson drowned. On cross-examination, the defendant claimed he had no idea what happened to his wife and stepson, and did not know how they sustained a number of bruises in the "accident." Given the prosecution's evidence concerning the victims' good swimming abilities, the lack of any injuries to them before the "accident," the calm sea, and the unlikelihood of the boat capsizing, the court found that defendant's explanation presented "a credibility question," and that "the state of his knowledge, what it was reasonable to expect that he *would* know, given the circumstances in which he was, was within the province of the jury to determine." (*Id.* at p. 394.) As such, the instruction would be useful to the jury, and was proper.

Similarly here, defendant's minimization of Leslie's injuries undermined his credibility. His testimony was "inherently implausible" and the instruction was proper. (*People v. Mask, supra,* 188 Cal.App.3d at p. 455.) As described above, however, the instruction was not only proper because defendant's testimony he was only aware of minor bruises and scratches from a fall on stairs and a bump against the bathroom sink was implausible. Defendant did not merely offer improbable explanations; he failed to explain critical facts that only he would know.

Even if we were to assume the instruction should not have been given, we would not reverse the judgment. An error in instructing with CALCRIM No. 361 does not require reversal unless it is reasonably probable that defendant would have obtained a

21

more favorable result absent the error. (See *Saddler, supra,* 24 Cal.3d at p. 683, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) There is no such probability in this case.

CALCRIM No. 361 warns the jury that any failure to deny or explain "is not enough by itself to prove guilt" and reminds the jury that the prosecution must prove the defendant guilty beyond a reasonable doubt. The instruction also gives the jury *discretion* to consider any failure to explain or deny the evidence against him. (CALCRIM No. 361 ["you *may* consider (his/her) failure to explain or deny in evaluating that evidence]," italics added.) Jurors are presumed to have followed the law. (*People v. Williams* (1995) 40 Cal.App.4th 446, 456.)

Additionally, the jury was instructed that "[s]ome of the instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." This instruction mitigates any potentially prejudicial effect of giving CALCRIM No. 361. (See *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472 [addressing CALJIC No. 2.62]; see also *Saddler*, *supra*, 24 Cal.3d at p. 684.) Moreover, the prosecutor did not discuss the application of CALCRIM No. 361 in her closing argument, and defense counsel explained in closing why the instruction did not apply.**[2]** Under these circumstances, it is improbable the jury improperly applied the instruction.

---

**[2]** During defendant's closing argument, his attorney argued: "I want to go on to one last thing that upset me yesterday in court. . . . . This is the judge's court. He makes critical decisions, and we have to follow the decisions that he makes. And, in my opinion, he made a very, very improper decision regarding one of the jury instructions you get, and this jury instruction goes to whether my client failed to deny or explain adverse testimony. I strenuously objected to you receiving this instruction, and here's why: my client has no obligation to prove to you his innocence. The burden is on the government to convince you beyond a reasonable doubt of his guilt. [¶] He explained what he knew about it. He only responded to the questions that his lawyer asked him, and counsel for the people is probably going to get up here and say, 'Well, he didn't tell us about this, and he didn't tell us about this, and he didn't tell us about that.' Why didn't he? Well, I didn't ask him. But she had an opportunity to ask him, and she didn't. [¶] If she wanted answers to certain questions, she had ample opportunity [to ask him]."

Lastly, the evidence against defendant was substantial. There was credible medical evidence that Leslie received the fatal injury within three or four hours of her death, while she was alone with defendant. The mere possibility that the injury could have occurred up to 24 hours before death was rebutted by evidence that Leslie was feeling fine, and by evidence that she had almost completely digested the corn she ate the day before at the park, some 24 hours before her death. Also, suspicious injuries started appearing once defendant entered her life. Leslie's pattern of injuries in various states of healing indicated abuse rather than any sort of accidental origin, and the evidence supported that defendant was the one abusing her. Moreover, the fresh injury to her frenulum indicated abuse, and is not an injury that is caused accidentally.

## 2. Prosecutorial Misconduct

Defendant complains of three instances of prosecutorial misconduct. First, defendant contends the prosecutor misstated the evidence when she said in closing argument that the coroner testified defendant must have socked Leslie in the stomach or stomped on her stomach. Second, defendant contends the prosecutor improperly told the jury to think about the case when they went home, before the case had been submitted to them for deliberation. Lastly, defendant contends the prosecutor appealed to the passion and prejudice of the jury by arguing an acquittal would send a message to the community that child abuse is okay so long as it happens behind closed doors. We disagree.

### a. Misstating the evidence

Dr. Carrillo was asked "[w]hat type of force or compression would be required to create an injury [of] the kind that you saw in Leslie?" He responded, "[s]omeone stomping on the abdomen, punching or kicking, or maybe compressing the body against an edge of a table." However, he ruled out that Leslie had been pressed against a table.

During her closing argument, the prosecutor argued that Leslie was not acting normally when mother got home from work, because "[t]his day she was fatigued and listless and in pain because her insides were torn in half, because she couldn't satisfy the great thirst that she had because everything was emptying through her stomach, because she had gas and bacteria and food particles floating where they shouldn't have been, and

23

that was because the defendant socked her in the stomach or stomped her in the stomach, as the coroner testified he must have done." Defense counsel objected that the prosecutor had misstated the evidence. The trial court sustained the objection, noting, "He did not say that." Defense counsel did not seek an admonition to the jury.

The prosecutor then clarified that "this type of injury occurs from a forceful impact" and that the experts testified that the only "accidental type of way they see an injury" like this is during a "motor vehicle accident." She explained that the testimony showed that an "adult man" could cause such an injury with a "forceful blow" and that defendant was the only one who could have hurt Leslie.

A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, he objected to the misconduct and requested that the jury be admonished to disregard the impropriety. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072.) An exception to the rule is that "a defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile." (*People v. Hill* (1998) 17 Cal.4th 800, 820; *People v. Noguera* (1992) 4 Cal.4th 599, 638.) In addition, failure to request an admonition does not forfeit the issue for appeal if "an admonition would not have cured the harm caused by the misconduct." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1333.) Here, defendant did not seek an admonition, and we can find no basis for concluding that an admonition would have been futile, or could not have cured the alleged misconduct. Quite the contrary, the trial court sustained the objection, so the court likely would have been amenable to admonishing the jury to disregard the misstatement about the coroner's testimony, if counsel had asked. Accordingly, the claim of prosecutorial misconduct has been forfeited for purposes of review. (*People v. Miller* (1990) 50 Cal.3d 954, 1001.)

Even if we ignore defendant's failure to preserve the claim for review, we reject the claim on the merits. "[M]ischaracterizing the evidence is misconduct." (*People v. Hill*, *supra*, 17 Cal.4th at p. 823.) However, the prosecutor is given wide latitude to broadly argue the law and facts of a case and to draw inferences from the evidence. (*People v. Lucas* (1995) 12 Cal.4th 415, 473.) The prosecutor may comment on the

actual state of the evidence, and may "urge whatever conclusions he deems proper." (*People v. Lewis* (1990) 50 Cal.3d 262, 283; see also *People v. Medina* (1995) 11 Cal.4th 694, 755.)

The challenged comment addressed the expert testimony about the force required to inflict the fatal injury. The prosecutor was making the point that the jury should draw the inference that defendant had inflicted the fatal injury, either by stomping or punching Leslie in the stomach, as the expert testified such trauma must have been the cause of Leslie's injury, and the evidence showed that defendant was the only one with Leslie on the day she died. Accordingly, the statement was based on permissible inference.

The cases cited by defendant are distinguishable, because they all involved argument that was untethered to any evidence. (See *People v. Kirkes* (1952) 39 Cal.2d 719, 726-727 [misconduct when prosecutor argued that delayed reporting of a crime by a prosecution witness was the result of fear when there was no such evidence in the record]; *People v. Hall* (2000) 82 Cal.App.4th 813, 815-816 [misconduct when the prosecutor commented during rebuttal that it could have called an uncalled witness to corroborate some key testimony, but doing so would have been repetitive]; *People v. Pitts* (1990) 223 Cal.App.3d 606, 702-704 [misconduct when prosecutor commented on answers provided by teachers during voir dire that children rarely report abuse to them].)

Moreover, under either federal or state standards, the prosecutor's statements, even if improper -- a finding we do not make -- could not have prejudiced defendant. (*People v. Roybal* (1998) 19 Cal.4th 481, 520; *People v. Bolton* (1979) 23 Cal.3d 208, 214-215.) The jury was instructed that statements by attorneys are not evidence. The jury is presumed to have followed this instruction. (*People v. Holt* (1997) 15 Cal.4th 619, 662.) Moreover, the evidence against defendant was significant. (*People v. Arias* (1996) 13 Cal.4th 92, 161.)

### b. Misstating the law

During her closing argument, the prosecutor argued that "[t]he murder is absolutely, at a minimum, a second degree murder, and that is based on the injuries she

suffered, the timing of those injuries, the only person who could have been responsible for those injuries, the fact that these are injuries abusive in nature, clearly inflicted and clearly fatal, and they cut short the life of this child, and I would submit to you when you're thinking about everything you've heard when you go home tonight, when you think about this case, you think about the circumstantial evidence --" Defense counsel objected on the basis of "[i]mproper argument." The trial court sustained the objection, noting that "deliberation occurs in the jury room." The prosecutor carried on, stating "Obviously, you can't talk about it with anyone and make up your mind, but we are people of common sense. We've lived with this case for two weeks, and you're going to be living with it until you deliberate -- " Defendant again objected, and requested that the court "assign prosecutorial error." The trial court stated "We'll do that at sidebar in a moment," and asked the prosecutor to proceed. The prosecutor stated, "So when you turn off your minds for the rest of the evening and when you come back tomorrow and you think about this case, when you're finally allowed to get into that jury room . . . ."

At recess, the defense counsel again requested an assignment of prosecutorial error, urging that jurors are not permitted to resolve the case until it has been submitted to them for deliberation, and that it was improper to imply that the jury had all the information needed to resolve the case when the defense had not yet given its closing argument. The trial court concluded, "I think you raise a legitimate concern. I don't find that it rises to the level of prosecutorial misconduct. . . . I've instructed them as well that they're not to discuss it or form any opinion."

A prosecutor commits misconduct when he or she misstates the law. (*People v. Bell* (1989) 49 Cal.3d 502, 538.) "[W]hen the claim [of prosecutorial misconduct] focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

While it is improper for jurors to conduct their own research or discuss the case outside the deliberating room (§ 1122), no case has held that it is improper for jurors to

26

think about the case privately. In *People v. Ledesma* (2006) 39 Cal.4th 641, the defendant argued it was error for the trial court to permit the jury foreperson to take jury instructions home to read, and that the court erred when it admonished the jury that "they could continue to think about the case, but they could not communicate their thoughts to anyone until they were back together for deliberations." (*Id*. at p. 729.) Finding no error, the court concluded a "juror participates in the deliberative process by 'participat[ing] in discussions with fellow jurors by listening to their views and by expressing his or her own views.' [Citation.] Indeed, it would be entirely unrealistic to expect jurors not to think about the case during the trial and when at home." (*Ibid*.) Clearly, jurors are not prohibited from engaging in unavoidable human behavior. There is simply no authority to suggest the prosecutor's statement amounted to misconduct. Moreover, the jury was properly instructed that they should not discuss the case or form an opinion until the case had been submitted to them, and after making the offending comments, the prosecutor reminded the jury that they should not discuss the case.

### c. Appealing to the passions and prejudices of the jury

During her closing argument, defense counsel argued that the prosecution's case was entirely circumstantial, and that "nobody saw my client do anything. Nobody saw it." She also argued, "This child comes in with bruises all over her body. That's a horrendous sight. I would be the first to agree with that, and we need to hold someone accountable for this right away. [¶] But, yeah, you should hold somebody accountable, but you should hold the right person accountable."

During her rebuttal, the prosecutor responded, "the defense attorney wants you to walk her client to the door because nobody saw him do it. I hate to tell you, folks, most of the time there are not direct witnesses to child abuse. It's a private crime. It's done behind closed doors. It's just the nature of the beast. People don't beat the crap out of their kids out in public. And if you walk him out this door because I can't tell you whether he bludgeoned her to death with his elbow, his fist, or his foot, what you're telling the community is that it's okay to kill your child, as long as you don't have to see

27

it." Defense counsel objected and requested an assignment of misconduct. The trial court took the objection under submission.

The prosecutor continued that "the message you'll be sending is that these children, who are already voiceless and powerless, and the only person who could tell you exactly what he used to beat her with is dead, what you'll be saying is that --" Defense counsel objected, and the trial court noted the objection. The prosecutor continued that "what you'll be saying is that as long as it's out of sight, you can keep it out of mind."

Later, out of the presence of the jury, the trial court concluded that no misconduct had occurred because the prosecutor's argument was in response to defense counsel's argument that the prosecution had not proven defendant's guilt because no witness testified to seeing him beat the child. The court found that the argument did not rise to the level of trying to incite community vengeance.

" '[A] prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence.' [Citation.]" (*People v. Redd* (2010) 48 Cal.4th 691, 743, fn. 25.) However, " '[i]solated, brief references to retribution or community vengeance . . . , although potentially inflammatory, do not [generally] constitute misconduct.' [Citations.]" (*People v. Wash* (1993) 6 Cal.4th 215, 262.)

Because defendant argued that the People's case was entirely circumstantial, and that defendant was not proven guilty because no one saw him hurt Leslie, it was fair for the prosecutor to argue that defendant should not be acquitted simply because no living witness could describe exactly how defendant inflicted the fatal blow. The challenged argument was not the theme of the prosecutor's closing, and was limited to an isolated comment in the prosecutor's rebuttal. (See *People v. Wash*, *supra*, 6 Cal.4th at p. 262.)

The cases on which the defense relies are distinguishable because they involve the prosecutor asking the jury to put themselves in the place of the victim. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1407 [jurors asked to imagine how the victim must have

28

felt]; *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 [same]; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250 [prosecutor asked jurors to imagine it was their child who had been murdered]; *People v. Fields* (1983) 35 Cal.3d 329, 363 [asked jurors to put themselves in the place of the victim]; *People v. Simington* (1993) 19 Cal.App.4th 1374, 1379 [same].)

Here, the prosecutor merely emphasized that child abuse happens behind closed doors, and that the jury could properly rely on circumstantial evidence because there is rarely direct evidence in such cases. Accordingly, we find no misconduct.

### 3. Cumulative Error

Defendant argues that the cumulative effect of the errors committed by the trial court requires the reversal of his convictions. We have found no errors to cumulate. Moreover, "[l]engthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice." (*People v. Hill*, *supra*, 17 Cal.4th at p. 844.) Any possible errors in this case were necessarily harmless and did not amount to a clear miscarriage of justice. (*People v. Bradford*, *supra*, 14 Cal.4th at p. 1064.)

### 4. Restitution

Defendant contends the trial court erred when it imposed a $5,000 restitution fine without making any "findings as to [defendant's] ability to pay that fine." At sentencing, the trial court imposed a victim restitution fund fine of $5,000, under section 1202.4, subdivision (b). Prior to the imposition of the fine, when the trial court indicated its intention to order the $5,000 fine, defense counsel objected that defendant "has no ability to pay the $5,000." Following a restitution hearing, the parties stipulated to victim restitution of $2,333.50. At neither hearing did defendant present any evidence about his inability to pay the fine.

Section 1202.4, subdivision (b) requires the trial court to impose a restitution fine of $240 to $10,000. Subdivision (c) provides: "The court shall impose the restitution fine unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. A defendant's inability to pay shall not be considered a

29

compelling and extraordinary reason not to impose a restitution fine.  Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b)."  The statute presumes a defendant has the ability to pay the fine.  (*People v. Romero* (1996) 43 Cal.App.4th 440, 448-449.)  And, a "defendant shall bear the burden of demonstrating his . . . inability to pay."  (§ 1202.4, subd. (d).)

Because defendant did not carry his burden of demonstrating an inability to pay the fine, we find no abuse of discretion.

## DISPOSITION

The judgment is affirmed.


GRIMES, J.

I concur:


RUBIN, Acting P. J.

30

**Flier, J.,  Concurring**

I concur in the disposition and in the opinion except for part one of the Discussion, in which the majority concludes the court properly instructed the jury with CALCRIM No. 361.  I believe the court erred in instructing the jury with CALCRIM No. 361.

The instruction as given provided in pertinent part:  "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating the evidence."

This instruction has been the target of some hostility.  As one court has emphasized, "[i]n the typical case it will add nothing of substance to the store of knowledge possessed by a juror of average intelligence."  (*People v. Haynes* (1983) 148 Cal.App.3d 1117, 1120.)  The instruction serves only to call particular attention to the testimony of the defendant and occasions the danger that the jury might infer the court intends to discredit the defendant's testimony.

CALCRIM No. 361 applies only when there is evidence within a defendant's knowledge he fails to explain or deny.  (*People v. Saddler* (1979) 24 Cal.3d 671, 682.) No inference can be drawn if the defendant does not answer a question because of some circumstance precluding his knowledge.  (*Id.* at p. 680; *People v. Roehler* (1985) 167 Cal.App.3d 353, 393.)  As the majority notes, a contradiction or conflict in the evidence is not a failure to explain or deny.  (*People v. Saddler*, *supra,* at p. 682.)  Moreover, the defendant's failure to recall specific details is not the same as a failure to explain or deny. (*People v. Roehler*, *supra*, at p. 393.)  Neither a conflict nor a failure to recall paves the way for giving this instruction.

Here, defendant explained or denied the evidence he said was within his knowledge.  He explained what he and Leslie did the day before and the day of her death. He explained how she appeared to be ill and how she got progressively worse until he called 911, but he did not know what was causing her illness.  He said he noticed bruises

1

only on Leslie's hands and leg the day before her death and nowhere else.  He explained how she fell on several recent occasions while getting out of the car or on the stairs at his chiropractor's office.  He denied punching her, kicking her, or hurting her with any kind of object.  He gave an overall account of his actions during the critical time frame and essentially denied committing the charged offense.  While defendant's evidence may have conflicted with the prosecution's evidence, there was no failure to explain or deny evidence within his knowledge.  The court, therefore, should not have instructed the jury with CALCRIM No. 361.

I nevertheless concur in the disposition because it is not reasonably probable defendant would have obtained a more favorable result absent this error, as explained by the majority.  The jury was otherwise properly instructed on reasonable doubt, and the evidence against defendant was substantial.  These circumstances convince me the error was not prejudicial.


FLIER, J.